**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **THE STEP2 COMPANY, LLC,** | Case No. 5:24-cv-00807-DAR |
| Plaintiff, | Judge David A. Ruiz |
| v. | **FIRST AMENDED COMPLAINT** |
| **LEDGE LOUNGER, INC.** | **DEMAND FOR JURY TRIAL** |
| and | |
| **CHRISTOPHER ANDERSON,** | |
| Defendants. | |

The Step2 Company, LLC ("Step2"), for its first amended complaint against Defendants Ledge Lounger, Inc. ("Ledge Lounger") and Christopher Anderson, states as follows:

<u>**SUMMARY AND NATURE OF THE ACTION**</u>

1.      Not all companies can thrive in the face of fair competition.  Regrettably, some choose to cheat rather than compete fairly.  Defendant Ledge Lounger is such a company.  When Defendants Ledge Lounger and Anderson—its founder and CEO—noticed that other companies were selling competitive chaise lounges, Defendants abused the trademark system by fraudulently seeking monopoly protection for the generic shape of an in-pool chaise lounge that had been around for *decades*.  Worse, Defendant Ledge Lounger submitted multiple bogus infringement reports with Amazon, resulting in the removal of successful and non-infringing chaise lounges of competitors, including Step2.  Step2 files this lawsuit to put an end to Defendants' abusive, anticompetitive tactics and to recover damages resulting from Defendants' bad-faith misconduct.

<u>**PARTIES**</u>

2.      Step2 is a Delaware limited liability company with a principal place of business at

10010 Aurora Hudson Road, Streetsboro, Ohio 44241.

3.     On information and belief, Defendant Ledge Lounger is a Texas corporation with a principal place of business at 616 Cane Island Parkway, Katy, Texas 77494.

4.     On information and belief, Defendant Anderson is an individual residing in Fulshear, Texas.  He is the founder and former CEO of Defendant Ledge Lounger.  On information and belief, each instance of Defendant Ledge Lounger's misconduct described below was taken at the direction of Defendant Anderson while he was CEO or exercised de facto control of Defendant Ledge Lounger and was executed with his full knowledge and participation, including the submission of a knowingly false declaration under oath to the United States Patent and Trademark Office ("USPTO") that was critical to the fraudulent procurement of U.S. Trademark Registration No.  6,932,905 ("the '905 Registration").  Defendant Anderson's personal involvement and benefit from these actions, coupled with his intent to harm competitors and stymie fair competition, demonstrate his misuse of the corporate structure for personal gain.  Moreover, as explained below, Defendant Anderson deliberately made misrepresentations regarding the functionality of the design of the purported trade dress, and, on information and belief, he strategically caused Defendant Ledge Lounger to use the fraudulent registration to target competitors, including Step2.

## JURISDICTION AND VENUE

5.     The below claims for declaratory judgment arise under the Federal Trademark Act of 1946, 15 U.S.C. § 1051 et seq., and under 28 U.S.C. §§ 2201 and 2202.

6.     Subject matter jurisdiction of this Court is conferred by 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, and this Court has supplemental jurisdiction for claims arising under state law under 28 U.S.C. § 1367.

7.     Venue in this judicial district is proper under 28 U.S.C. § 1391 at least because this

2

judicial district is where Defendant Ledge Lounger is subject to the Court's personal jurisdiction with respect to this action and because Defendant Ledge Lounger's false trademark claims arose in this district.

8.     This Court has personal jurisdiction over Defendants at least because the Court's exercise of personal jurisdiction is consistent with the Ohio Constitution and the United States Constitution.  In addition, this Court has personal jurisdiction over Defendants at least because Step2's causes of action arise from (1) Defendant Ledge Lounger's causing tortious injury in Ohio, where Defendant Ledge Lounger regularly does and solicits business; and (2) Defendants' causing tortious injury in Ohio to Step2 "by an act outside this state committed with the purpose of injuring persons, when [Defendants] might reasonably have expected that some person would be injured thereby in this state."  Ohio Rev. Code § 2307.382; *SnapRays*, *dba SnapPower v. Lighting Def. Grp.*, 100 F.4th 1371, 1378 (Fed. Cir. May 2, 2024) (holding extra-judicial enforcement activities through Amazon subjected defendant to personal jurisdiction in plaintiff's state for declaratory judgment claim, reversing district court's granting of motion to dismiss for lack of personal jurisdiction).

## **BACKGROUND COMMON TO ALL CLAIMS**

### *Step2 and Its Vero Pool Lounger*

9.     Step2—located in Streetsboro, Ohio—was founded in 1991 and is one of the largest American manufacturers of preschool and toddler toys.  Step2 also is one of the world's largest rotational molders of plastics.

10.     Over the years, Step2 has successfully expanded from toys into other areas, including the home and garden market.

11.     Most recently, in 2023, Step2 expanded further into the pool category and now sells pool furniture, which includes the "Vero Collection":



**Step2's Vero Collection**

12.     The Vero Collection has been an enormous success for Step2.  One of the best sellers in the Vero Collection is the Vero Pool Lounger, an outdoor pool chair with a sleek, minimalist design in the well-known shape of a curved chaise lounge, as shown below:

 

**Step2's Vero Pool Loungers**

4

*History of Chaise Lounges*

13.    A "chaise longue" (or the anglicized "chaise lounge") originally referred to an upholstered sofa in the shape of a chair that was long enough to support the legs of the sitter.  The modern chaise lounge was first popularized in 16th-century France, created to allow the wealthy to rest without the need to retire to a bedroom.

14.    Today, however, the chaise lounge now broadly refers to any long reclining chair sized to support an entire body.

15.    The shape of the modern chaise lounge has a curved profile and has been recognizable and ubiquitous for at least a century.  For example, below are some of the more famous designs:

| Designer(s) | Date | Name | Image |
|---|---|---|---|
| Edward Wormley | 1948 | Listen-to-Me Chaise |  |
| Greta M. Grossman | 1951 | GMG Chaise Lounge |  |
| Adrian Pearsall | 1960s | Wave Lounge Chair |  |

| Designer(s) | Date | Name | Image |
|---|---|---|---|
| Poul Kjærholm | 1960s | PK 24 Chaise Lounge Chair | |
| Niels Hvass | 1996 | Wave | |
| BuskHertzog | 2003 | SENSE lounge chair | |

16.    Chaise lounges have been widely available at retail stores in the United States for decades.  For example, on information and belief, the Wave chaise from Float LLC, shown below, was available at least as early as 2008:



**Wave Chaise as Shown in Architectural Digest**



**Wave Chaises as Shown in Dwell Magazine**

***Defendant Ledge Lounger Improperly Attempts
To Monopolize the Shape of the Chaise Lounges***

17.     Since approximately 2019, Defendant Ledge Lounger has attempted to secure for itself intellectual property protection for the various shapes of in-pool chaise lounges.

18.     For example, in December 2019, Defendant Ledge Lounger filed applications for two design patents.  In April 2021, those applications issued as U.S. Patent Nos. D917,189 and D917,190.

19.     Later, in November 2021, Defendant Ledge Lounger filed another design patent application, issuing as U.S. Patent No. D985,953 in May 2023.

20.     Below are figures from the three design patents:



FIG. 1
**Defendant's
U.S. Patent No. D917,189**

FIG. 1
**Defendant's
U.S. Patent No. D917,190**

FIG. 1
**Defendant's
U.S. Patent No. D985,953**

21.     Unlike utility patents, the purpose of design patents is to protect the ***ornamental design*** of an "article of manufacture" for a limited time: 15 years.  35 U.S.C. §§ 171, 173.  The subject matter that is claimed "is the design embodied in or applied to an article of manufacture (or portion thereof) and not the article itself."  Manual of Patent Examining Procedure § 1502.

22.     To obtain a design patent, the claimed design must be "new," and the application must be filed within one year after the first public disclosure.  35 U.S.C. §§ 102, 171.   To be "new," an ordinary observer must view the design as different, rather than a modified version of

7

an already existing design with minor differences.  *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1241 (Fed. Cir. 2009).

23.     And, importantly, the protection is limited to the specific design shown and claimed in solid lines—not dashed or broken lines, which are meant to reflect what has ***not*** been claimed. *See In re Zahn*, 617 F.2d 261, 266-67 (CCPA 1980); *In re Blum*, 374 F.2d 904, 907 (CCPA 1967).

24.     Although design patents may provide narrow protection, Defendant Ledge Lounger—on information and belief—wanted to secure for itself exclusivity over the generic shape of its "Signature Chaise" pool lounge, which Defendant Ledge Lounger had been selling since 2011.  Defendant Ledge Lounger could not obtain design patent protection for that shape, though, at least because that generic shape had long been in the public domain and in use by others.

25.     Consequently, unable to secure for itself patent protection on the generic shape of the "Signature Chaise," Defendant Ledge Lounger was seemingly powerless to stop others from competing fairly in the marketplace.

26.     And so, Defendant Ledge Lounger chose to pursue a different path to try to stymie legitimate competition: ***trademark law***.

27.     But the purposes of trademark law and patent law are very different.  While patent law incentivizes innovation by granting inventors exclusive rights to their inventions for a limited time, the primary purpose of trademark law is to prevent ***consumer confusion*** by ensuring that consumers can identify and rely upon consistent quality and origin of products and services.

28.     Determined to prevent healthy competition with its "Signature Chaise" and disregarding the purpose of trademark law, Defendant Ledge Lounger filed a trademark application in August 2019, seeking for itself the exclusive rights to the shape of the "Signature Chaise"—eight years after Defendant Ledge Lounger had been selling it.

29.     Specifically, Defendant Ledge Lounger sought protection in alleged **trade dress**, i.e., the visual appearance of a product or its packaging, which can be protected only under one of two circumstances.  First, the product design can be protected if it is **inherently distinctive**, i.e., its "intrinsic nature serves to identify a particular source." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  Second, a non-inherently distinctive trade dress is protectable if it **acquires distinctiveness** through secondary meaning, which occurs when, "in the minds of the public, the primary significance of a [trade dress] is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982).

30.     The shape of Defendant Ledge Lounger's "Signature Chaise," however, is not inherently distinctive, and the public has never associated the generic in-pool chaise lounge shape with Defendant Ledge Lounger or come to rely on the generic in-pool chaise lounge shape as a source identifier.

***Competitors Notice Defendant Ledge Lounger's***
***Anticompetitive Abuse of The Trademark System,***

31.     After the trademark application published in November 2021, competitors noticed that Defendant Ledge Lounger had inappropriately attempted to monopolize the generic design of an in-pool chaise lounge, and, in March 2022, Advantus, Corp. ("Advantus") filed a "notice of opposition" with the Trademark Trial and Appeal Board ("TTAB") of the USPTO, opposing the application.  Attached as Exhibit 1 is a copy of Advantus's notice of opposition, and the documents for the related proceeding—including the exhibits to the notice of opposition—are available at https://ttabvue.uspto.gov/ttabvue/v?pno=91274876.

32.     Advantus's notice of opposition correctly demonstrated that the alleged trade dress was not registrable for multiple reasons, including: (1) the alleged trade dress is functional; (2) the alleged trade dress is aesthetically functional; (3) the alleged trade dress is not inherently

distinctive and had not acquired distinctiveness; and (4) Defendant Ledge Lounger had attempted to obtain a registration through fraud.  (*See, generally*, Ex. 1.)

33.     Before the TTAB could issue a final decision with respect to the notice of opposition, however, Defendant Ledge Lounger—on information and belief—convinced Advantus to withdraw the opposition.

34.     And so, on November 22, 2022, Advantus withdrew its opposition, and, on December 27, 2022, with the opposition withdrawn, the USPTO allowed the '905 Registration (attached as Exhibit 2), shown and described as follows:



The mark consists of a three-dimensional configuration of a chair curved like a wave where the back of the chair slopes down and the lower half of the chair curves up and down towards the right. The bottom side of the chair and the horizontal line at the base of the curve to the right side appear in broken lines and are not claimed as features of the mark.

35.     Advantus's grounds for opposing the registration, however, were correct, and, as explained below, the USPTO would not have issued the '905 Registration had Defendants not made certain knowingly false representations to the USPTO.

*Defendants' Fraud upon the USPTO*

36.     Defendant Ledge Lounger's "Signature Chaise" is designed to support a full adult and allow partial submersion in water; the in-pool chaise lounge is therefore shaped strictly to accomplish the in-pool chaise's purpose.  The product configuration is thus functional and not registrable under the Trademark Act § 2(e), 15 U.S.C. § 1052(e)(5).

37.     Not surprisingly, before the USPTO allowed the registration, the USPTO trademark examining attorney assigned to the application noted the functionality of the alleged trade dress and initially rejected the application in December 2019 on the ground of functionality.

38.     In response, though, Defendants submitted a declaration on June 10, 2020, by Defendant Ledge Lounger's Chief Executive Officer, Defendant Anderson.  A copy of the declaration is attached as Exhibit 3.

39.     In the declaration, Defendant Anderson made the following statement (the "Patent Statement") under oath:

> Neither the applied-for-mark, nor any features thereof, is or has been the subject matter of a design or utility patent or patent application, including expired patents and abandoned patent applications.

(Ex. 3 ¶ 29.)

40.     That statement is false.  When Defendant Anderson made that statement, he was one of the named inventors of U.S. Patent No. 10,104,975 ("the '975 Patent"), which expressly described the functionality of Defendant Ledge Lounger's "Signature Chaise."  Attached as Exhibit 4 is a copy of the '975 Patent.

41.     The '975 Patent explains that the design of the Signature Chaise is functional at least because it provides ergonomic support for various parts of the body, enables the chair to be partially submerged, supports different water levels, and ensures that specific body parts remain above water, all essential for the intended use described in the '975 Patent.

11

42.    Below are Figures 1 and 2 from the '975 Patent, illustrating a submergible chair and table:



FIG. 1                                                              FIG. 2

43.    The '975 Patent describes the chair as follows:

FIG. **1** illustrates a perspective overview view of a submergible furniture **100**.

In one embodiment, said submergible furniture **100** can comprise said table **100***a* and said chair **100***b*.

...

As illustrated, said submergible furniture **100** (comprising said table **100***a*, said chair **100***b*, and similar furniture) can be designed to be submerged into a body of water (or said external body of liquid **800**, discussed and illustrated below).

For example, in one embodiment, said chair **100***b* can be used in the water of a swimming pools, wet environments, outdoor patios, or similar locations.

...

FIG. **2** illustrates a perspective overview view of a chair **100***b*.

In one embodiment, said chair **100***b* can comprise said back **202**, said seat **204**, said lower bend **206**, said foot rest **208**, said top surface **210**, said bottom surface **212**, said first side **214***a*, said second side **214***b*, said top edge **216** and said bottom edge **218**.

Designs for said chair **100***b* are well-known in the art and may comprise variations on the shape and dimensions of said chair **100***b*. Here, said chair **100***b* has a wave shape having said back **202** with a higher height than said lower bend **206**. Likewise, said lower bend **206** has a gentle arc as coming up from said seat **204** and down to said foot rest **208**.

44.     This description is accurate.  Not only is the design indeed "well known," but each of the elements of the "wave shape" is also functional, making the design primarily functional as a whole.  Indeed, it is incontrovertible that the design naturally aligns with the contours of the human body, particularly supporting the back and legs.

45.     The '975 Patent explains that the wave shape is functional for another reason: the shape allows the chair to function as a chair ***while partially submerged in water***.  That is, "said chair **100***b* has a first lower portion **402***a* and a second lower portion **402***b* where water may be captured having different water levels." '975 Patent, col. 5, ll. 27-29.  Without the wave shape, there would not be two lower portions for capturing different water levels, as shown below in both Figure 8 from the patent and an image of Defendant Ledge Lounger's "Signature Chaise" from https://ledgeloungers.com/products/signature-chaise?variant=47291763851566:



FIG. 8

**"Signature Chaise"**

46.     For at least these reasons, the design of the Signature Chaise is not an ornamental, incidental, or arbitrary aspect of the submergible furniture disclosed and claimed in the '975 Patent.

Indeed, the design is the reason that the submergible furniture works as claimed and disclosed in the patent.

47.     In the same declaration to the USPTO, Defendant Anderson made the following statement (the "Development Statement"): "The design at issue was developed separate from the function of lounge and outdoor furniture."  (Ex. 3 ¶ 35.)

48.     That statement also is false.

49.     In fact, Defendant Anderson had made numerous representations in various podcasts and interviews touting the functionality of the Signature Chaise design and how functional considerations drove development of the design.

50.     For example, on information and belief, during a September 2019 podcast called "Outside the Box with Casual Living," Defendant Anderson made the following statements:

- I set out to really come up with something that you could utilize in the pool, that you could partially be submerged, and at the same time it wouldn't damage the pool interior and it wouldn't damage the product.

- So, we actually have a patent on maintaining water in the product higher in which than [sic] the body it sits.

- With our products, we did, on purpose, angle the back of the chaise a little bit lower than most and the reason being is because, if I want to lay back and forget about the world, I can take the headrest pillow off and it's very comfortable, and I can lay back and forget about the world. If I want to see the activity that is going on in front of me, I can add the headrest pillow and now kinda bring my head forward a little bit where I can pay attention to what's going on. Whereas in, a few of the recent competitors, [they] have brought the back quite a bit more forward and now kinda stuck in this spot of wanting to see what's in front of me and not really being able to lay back. And's that, if anything I would say that's the one negative thing about in-water furniture, is it's not adjustable, other than taking the headrest pillow on and off.

51.     The podcast is available on Spotify at https://open.spotify.com/episode/1dVujgiQ7IbMNUmWHX573G.

52.     Anderson made the following similar statements about the functional

14

considerations for the design of the Signature Chaise during a December 2018 "Pool Chasers" podcast:

- You know for us, in the beginning, we did some basic research on ergonomics, you know, the average size individual. Because to you the [Signature] chaise might be extremely comfortable, but look, I'm not afraid to say it live on a podcast that to some people it's not comfortable at all. Well certainly we had to develop and design the chaise to fit the average individual, the average person out there. So, we had to say what's our range? Is it going to be the person that's 5' 8" to 6 foot, or is it going to be a person that's 5' 4" to 5' 8"?

- Well, there is information and stats and data on ergonomics. You can simply do an online survey or, excuse me, an online search and find that information. So, we, you know, we took that into consideration, we also, you know, meet some quick type prototype type things and lay in them. But what was more important was the way that you interact with the water making sure that it was gonna be low enough to the ground where you're actually, when you're in the water you're not just—you're actually laying in the water, you have water on your butt on your body. Some of those things were a little bit more important.

- So, you know, we had to we had to accept the reality of this is gonna be a hard plastic that's in the pool, so it was really important for it to have a contour that related to the average body style and type. We also had to sacrifice, because we did have some people sit in our original prototypes and say, hey this doesn't fit me well. Well, you know, I'm sorry that it doesn't fit you well, but we have to we have to hit the average market here because there's only so many people outside of the average and the more and more you go outside the average the less people it's gonna be comfortable for. So, you know, we did, we did do our ergonomic research.

53. The podcast episode is available on Spotify at https://open.spotify.com/episode/1DlSuXw9gKG1oosbpSTbWH and on YouTube at https://www.youtube.com/watch?v=CvJoYkiX_FI.

54. During an interview on the April 24, 2020 "StellarZone" podcast, Anderson likewise explained how the Signature Chaise's design was dictated by functional considerations:

- I quickly noticed that a lot of [customers] would drag their patio furniture that [they] had purchased, from whether it was from Restoration Hardware or a local furniture store, in the pool and put it on the tanning ledge. And obviously we would see the tanning ledge—the plaster on the tanning ledge—get damaged because the metal of the furniture, as well as we would see the furniture get damaged pretty quickly because of the chemicals and the harsh environment of the swimming pool. So, from that I was kind of inspired to develop a piece of furniture that you could put in the tanning ledge and you could lay out with a portion of your body in the water, a portion of your body out of the water, and really enjoy that space. And that's pretty much how Ledge Lounger founded.

55. The podcast is available on Spotify at https://open.spotify.com/episode/064Vvs1RUleBFdZBIbkMxK and on YouTube at https://www.youtube.com/watch?v=fKKqDF4hVGk.

56. On information and belief, both Defendants Ledge Lounger and Anderson knew that both the Patent Statement and the Development Statement were false when Defendants submitted the declaration to the USPTO.

57. On information and belief, Defendants submitted the false declaration with the intent to deceive the USPTO and to stymie fair competition and thereby intended not only to harm consumers (including in Ohio) by limiting consumer choice and commanding inflated prices but also to harm Defendant Ledge Lounger's competitors (including in Ohio).

58. Each of the Patent Statement and the Development Statement was material, and, on information and belief, the USPTO would not have issued the '905 Registration had Defendants not submitted the false declaration.

59. On information and belief, ever since Defendant Ledge Lounger obtained the '905 Registration, Defendants Ledge Lounger and Anderson have known that the alleged trade dress of the '905 Registration is functional, is aesthetically functional, is not distinctive, is generic, and was obtained through fraud.

16

***Defendants' Abusive, Anticompetitive Weaponization of the '905 Registration***

60.     With the '905 Registration in hand, Defendant Ledge Lounger wasted no time in asserting it against competitors.

61.     For example, Defendants noticed that competitor Luxury Lounger, Inc. ("Luxury Lounger") had begun threatening Defendant Ledge Lounger's market share with the sale of a competitive in-pool chaise lounge.

62.     In response to this threat, on information and belief, Defendant Anderson caused Defendant Ledge Lounger to sue Luxury Lounger in U.S. District Court for the Southern District of Texas, Case No. 23-cv-727, for alleged infringement of the '905 Registration. The case was dismissed on June 6, 2024, after the parties settled the matter.

63.     Defendants were not finished, however. On information and belief, when they noticed that another competitor—Global Lift Corp. dba Global Pool Products ("Global Pool Products")—had likewise been selling a competitive in-pool chaise lounge, Defendant Anderson caused Defendant Ledge Lounger to sue Global Pool Products in U.S. District Court for the Southern District of Texas, Case No. 23-cv-4258, for alleged infringement of the '905 Registration.

64.     On information and belief, Defendant Ledge Lounger filed its lawsuits against Luxury Lounger and Global Pool Products knowing that the '905 Registration is invalid and unenforceable and that the lawsuits were objectively baseless.

65.     Defendants also submitted one or more infringement reports to Amazon, asserting that in-pool chaise lounges of Global Pool Products had infringed the '905 Registration.

66.     In response, on information and belief, Amazon removed the listing for Global Pool Products' in-pool chaise lounge without analyzing or investigating the merits of Defendant Ledge Lounger's infringement reports.

17

67.     Moreover, on information and belief, when Amazon removed the listing for Global Pool Products' in-pool chaise lounge, Amazon was unaware of the allegations that the '905 Registration (1) is functional, (2) is aesthetically functional, (3) is not distinctive, (4) is generic, and (5) was obtained through fraud.

68.     Because the '905 Registration is invalid and obtained through fraud, Global Pool Products filed a petition with the TTAB in November 2023 to cancel the registration, explaining correctly that the alleged trade dress is generic, that the alleged trade dress is functional, and that the '905 Registration was obtained through fraud.  (*See, generally*, Global Pool Product's Petition for Cancellation, attached as Exhibit 5.)  The documents for the related proceeding—including the exhibits to the petition—are available at https://ttabvue.uspto.gov/ttabvue/v?pno=92083609.

69.     Four days later, Defendant Ledge Lounger sued Global Pool Products in U.S. District Court for the Southern District of Texas, Case No. 23-cv-4258, asserting nine claims for relief, including claims for alleged infringement of the '905 Registration.  Notably, however, Defendant Ledge Lounger did not sue Global Pool Products for alleged infringement of any design patent.  Global Pool Products successfully moved to transfer the action, which is now pending in the U.S. District Court for the Eastern District of Michigan, Case No. 24-cv-11267.

### *Defendants' Anticompetitive Attacks against Step2*

70.     While Global Pool Products' motion was pending, on April 3, 2024, Defendant Ledge Lounger sent a cease and desist letter to Step2 at its headquarters in Streetsboro, Ohio, alleging that Step2's Vero Pool Lounger infringed the '905 Registration.  Defendant Ledge Lounger did not allege that Step2 had infringed any of Defendant Ledge Lounger's patents.

71.     Defendant Ledge Lounger's Signature Chaise in-pool lounger costs much more than Step2's Vero Pool Lounger.  On information and belief, Defendant Ledge Lounger's Signature Chaise costs $799 while Step2's Vero Pool Lounger costs $249.99.

72.     On information and belief, beginning around the same time that Defendant Ledge Lounger sent the cease and desist letter to Step2, Defendant Ledge Lounger began submitting infringement reports to Amazon, demanding removal of Step2's Vero Pool Lounger from Amazon and falsely alleging that Step2's Vero Pool Lounger listing (1) infringes the '905 Registration, (2) creates a "misleading impression of affiliation" with Defendant Ledge Lounger, (3) creates a "link" with Defendant Ledge Lounger, (4) "creates a risk of consumer confusion," and (5) includes "false or misleading representations of fact."

73.     When Defendant Ledge Lounger submitted its multiple infringement reports to Amazon, though, Defendant Ledge Lounger did not inform Amazon that the '905 Registration (1) is allegedly functional, (2) is allegedly aesthetically functional, (3) is allegedly not distinctive, (4) is allegedly generic, or (5) was allegedly obtained through fraud.

74.     Yet, when Defendant Ledge Lounger submitted its infringement reports regarding Step2's Vero Pool Lounger, Defendant Ledge Lounger threatened to sue Amazon if Amazon refused to remove Step2's listings for the Vero Pool Lounger.

75.     On information and belief, Defendant Ledge Lounger knew Step2 had significant sales of the Vero Pool Lounger through Amazon.

76.     On information and belief, each time Defendant Ledge Lounger submitted an infringement report to Amazon, Defendant Ledge Lounger knew the report was objectively baseless at least because (1) the '905 Registration was invalid, (2) the '905 Registration was obtained through fraud, and (3) Step2's Vero Pool Lounger did not infringe the '905 Registration.

19

77.     In other words, Defendant Ledge Lounger willfully and maliciously submitted false and baseless infringement reports to Amazon with the purpose of stymieing fair competition and harming Step2, including harming Step2's business relationships with both Amazon and Step2's customers.

78.     In the pool products business, the early buying season is critical for manufacturers like Step2, Defendant Ledge Lounger, and Global Pool Products.

79.     On information and belief, Defendant Ledge Lounger strategically timed its infringement reports with Amazon for both Step2 and Global Pool Products with the beginning of the early buying season to maximize harm to Step2 and Global Pool Products.

80.     On information and belief, each time Defendant Ledge Lounger submitted an infringement report to Amazon regarding Step2's Vero Pool Lounger, Amazon automatically removed the listing from Amazon without conducting any independent investigation of alleged infringement and validity, only relisting the product after Step2 appealed the removal.

81.     On information and belief, each time Defendant Ledge Lounger submitted an infringement report to Amazon regarding Step2's Vero Pool Lounger, Defendant Ledge Lounger knew that Amazon would remove the listings for Step2's Vero Pool Lounger as standard operating procedure, regardless of the merits of Defendant Ledge Lounger's allegations, just as Amazon had done in response to reports regarding Defendant Ledge Lounger's other competitors.

82.     Moreover, when Defendant Ledge Lounger submitted its infringement reports with Amazon regarding Step2's Vero Pool Lounger, Defendant Ledge Lounger purposefully directed its activities at Step2 in Ohio, intending effects that would be felt in Ohio, and, indeed, that were expressly aimed at Ohio.

83.     Ever since Defendant Ledge Lounger first submitted its false infringement reports

to Amazon in April 2024, Defendant Ledge Lounger has continued to submit false reports through at least July 2024, over and over again, resulting in the product's automatic removal from Amazon and relisting only after days of delay while Step2 appealed the removal.

84.     As a result of Defendant Ledge Lounger's false statements and related misconduct, Step2 has already lost significant sales of the Vero Pool Lounger, and, unless the Court enjoins Defendant Ledge Lounger, Step2 will suffer millions of dollars in additional damages as well as serious and irreparable harm, including to the reputation and goodwill that Step2 has spent years and significant resources building with its customers.

85.     Because the USPTO erred in registering Defendant Ledge Lounger's trademark application, which Defendant Ledge Lounger sought and obtained through fraud, Step2 filed its own petition for cancellation of the '905 Registration.  Attached collectively as Exhibit 6 is a copy of Step2's petition for cancellation, together with its exhibits.  The documents for the proceeding are available at  https://ttabvue.uspto.gov/ttabvue/v?pno=91274876.   That proceeding is stayed pending the outcome of this action.

### *The Effects of Defendant Ledge Lounger's Anticompetitive Efforts*

86.     Defendant Ledge Lounger sells its Signature Chaise in-pool chaise lounge in Ohio. For example, on Defendant Ledge Lounger's website, Defendant Ledge Lounger identifies "Shawnee Pools" in Lima, Ohio, as part of Defendant Ledge Lounger's "Worldwide Dealer Network."  *See*  https://ledgeloungers.com/pages/showrooms.   On information and belief, Defendant Ledge Lounger also has been selling its Signature Chaise in-pool chaise lounge online at Amazon, including to Ohio customers, at least as early as Defendant Ledge Lounger received the  '905  Registration.  *See*  https://www.amazon.com/Ledge-Lounger-Signature-Chaise-Depths/dp/B073V9R1GG/.

87.     On information and belief, multiple competitors of Defendant Ledge Lounger—and targets of Defendants' anticompetitive efforts (e.g., Global Pool Products, Luxury Lounger, and Advantus)—sold competitive in-pool chaise lounges in physical locations in Ohio and to Ohio customers through Amazon.

88.     On information and belief, Defendants engaged in its anticompetitive misconduct—including the fraudulent procurement of the '905 Registration and communications with Amazon—to stymie fair competition and thereby not only to harm consumers in Ohio by limiting consumer choice and commanding inflated prices but also to harm Defendant Ledge Lounger's competitors, including in Ohio, such as Step2.

89.     On information and belief, as further proof of Defendant Ledge Lounger's bad faith and malice, Defendant Ledge Lounger stated to Global Pool Products that Defendant Ledge Lounger would be willing to withdraw its infringement claims against Global Pool Products if it would withdraw its challenges to the '905 Registration, thereby allowing Defendant Ledge Lounger to pursue larger competitors and either maintain or obtain a monopoly over the in-pool chaise lounge market.

90.     On information and belief, Defendant Ledge Lounger intended to harm Step2 and Ohio customers when Defendant Ledge Lounger made its anticompetitive offer to settle its dispute with Global Pool Products.

91.     On information and belief, both consumers in Ohio and Defendant Ledge Lounger's competitors in Ohio were harmed by Defendants' misconduct, and the harm was both intentional and foreseeable.

### FIRST CLAIM FOR RELIEF
**(Declaratory Judgment of Invalidity and Unenforceability of the '905 Registration)**

92.     Step2 repeats and incorporates by reference the allegations set forth in the foregoing

paragraphs.

93.     As explained above and in detail in Advantus's notice of opposition, the '905 Registration is invalid and unenforceable at least because the purported trade dress (1) is functional, (2) is aesthetically functional, (3) is not distinctive, (4) is generic, and (5) was obtained through fraud. (*See, generally*, Ex. 1.) Each of these reasons independently renders the '905 Registration invalid or unenforceable.

94.     For example, with respect to functionality, the purported trade dress for the in-pool chaise is functional at least because it provides ergonomic support for various parts of the body, enables the chair to be partially submerged, supports different water levels, and ensures that specific body parts remain above water.

95.     Indeed, Defendant Ledge Lounger's own advertisements tout that the functional aspects of the design of the '905 Registration include having "[f]ine contours to support the body" and "[s]tacks easily for storage."

96.     With respect to aesthetic functionality, Defendant Ledge Lounger likewise touts the "eye catching" design of the '905 Registration and refers to the chairs as "stylish pieces" that enhance the visual appeal of an in-pool chaise lounge. On information and belief, customers purchase the Signature Chaise because they like the ornamental appearance of the design.

97.     With respect to lack of distinctiveness, the design of the '905 Registration is not inherently distinctive at least because the design consists of a product configuration. Moreover, other companies market and sell in-pool chaise lounges that include designs substantially similar to the '905 Registration. But customers have not come to recognize the design of the '905 Registration as distinctive of Defendant Ledge Lounger's goods or as indicating the source of Defendant Ledge Lounger's goods. The primary significance of the design of the Signature Chaise

in the minds of consumers is, quite simply, not to identify or indicate the source of the Signature Chaise product.

98.     Moreover, Defendant Ledge Lounger has not promoted the design of the Signature Chaise as a mark in its advertising, nor has Defendant Ledge Lounger engaged in "look for" advertising that highlights or emphasizes the design as anything other than the shape of the Signature Chaise product.

99.     With respect to the generic nature of the '905 Registration, the design primarily identifies the product category of in-pool chaise lounges rather than serving as an indicator of the source or origin of the product, and the design is therefore incapable of distinguishing the goods of one manufacturer from those of another.

100.    Last, with respect to fraud, the Patent Statement and the Development Statement submitted to the USPTO by Defendants were knowingly false and were material to the examining attorney's decision to approve the registration for publication, at least because they directly addressed the functionality concerns that had initially led to the rejection of the application and misled the examining attorney into believing that the trade dress was non-functional and eligible for registration.

101.    There is an actual, substantial, and continuing justiciable controversy between Defendant Ledge Lounger and Step2 regarding the validity and enforceability of the '905 Registration.

## SECOND CLAIM FOR RELIEF
### (Cancellation of the '905 Registration)

102.    Step2 repeats and incorporates by reference the allegations set forth in the foregoing paragraphs

103.    Under the Lanham Act, "[i]n any action involving a registered mark the court may

24

determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."  15 U.S.C. § 1119.

104.    The design of the '905 Registration (1) is functional, (2) is aesthetically functional, (3) is not distinctive, (4) is generic, and (5) was obtained through fraud.

105.    Each of these reasons independently warrants cancellation of the '905 Registration.

## THIRD CLAIM FOR RELIEF
### (Declaratory Judgment of Noninfringement of the '905 Registration)

106.    Step2 repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

107.    Notwithstanding the invalidity and unenforceability of the '905 Registration, Step2's Vero Pool Lounger does not infringe the '905 Registration.

108.    That is, Step2's Vero Pool Lounger is not likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval with respect to Step2, Defendant Ledge Lounger, or Defendant Ledge Lounger's goods.

109.    There is an actual, substantial, and continuing justiciable controversy between Defendant Ledge Lounger and Step2 regarding Step2's alleged infringement.

## FOURTH CLAIM FOR RELIEF
### (Tortious Interference)

110.    Step2 repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

111.    When Defendant Ledge Lounger threatened Amazon and submitted its infringement reports with Amazon regarding Step2's Vero Pool Lounger, Defendant Ledge Lounger knew that Step2 had a business relationship with Amazon, that Step2 had made significant

sales of the Vero Pool Lounger through Amazon, and that Step2 had existing and prospective business relationships with Amazon's customers with respect to the Vero Pool Lounger.

112.    On information and belief, Defendant Ledge Lounger knew that Amazon's customers use Amazon as a search engine to discover and learn about potential products.  For example, rather than use a traditional search engine such as Google or Bing, Amazon's customers frequently use the Amazon website to determine which products exist for a given category, such as by searching for "in pool lounge chairs."

113.    Defendant Ledge Lounger made its threats and submitted its infringement reports in bad faith with the intentional and improper purpose to prevent Amazon's customers (and Step2's potential customers) from learning about the Vero Pool Lounger, to prevent sales of the Vero Pool Lounger, and to stymie Step2's business relationships.

114.    Step2 has been damaged by Defendant Ledge Lounger's tortious interference and is entitled both to monetary relief—including lost profits—in an amount to be determined at trial; Step2 also is entitled to equitable relief from the Court to stop the current harm caused by Defendant Ledge Lounger's misconduct and to prevent Defendant Ledge Lounger from causing similar harm in the future.

## FIFTH CLAIM FOR RELIEF
### (Defamation)

115.    Step2 repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

116.    The multiple infringement reports from Defendant Ledge Lounger to Amazon regarding Step2's listing for the Vero Pool Lounger were false.

117.    Defendant Ledge Lounger knew the reports were false.

118.    Step2 has been damaged by Defendant Ledge Lounger's defamatory statements and

is entitled both to monetary relief—including lost profits—in an amount to be determined at trial and to equitable relief from the Court to stop the current harm caused by Defendant Ledge Lounger's misconduct and to prevent Defendant Ledge Lounger from causing similar harm in the future.

## SIXTH CLAIM FOR RELIEF
### (Liability For False or Fraudulent Registration Under 15 U.S.C. § 1120)

119.    Step2 repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

120.    Under 15 U.S.C. § 1120, "[a]ny person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof."

121.    Defendant Anderson, while CEO of Defendant Ledge Lounger, together with Defendant Ledge Lounger procured the '905 Registration through a false or fraudulent declaration.

122.    Defendants Ledge Lounger and Anderson used the '905 Registration to harm Step2.

123.    Step2 has been damaged by Defendants' procurement and use of the '905 Registration and is entitled both to monetary relief—including lost profits—from both Defendants in an amount to be determined at trial; Step2 also is entitled to equitable relief from the Court to stop the current harm caused by Defendants' misconduct and to prevent Defendants from causing similar harm in the future.

## SEVENTH CLAIM FOR RELIEF
### (Attempted Monopolization)

124.    Step2 repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

27

125.    Defendant Ledge Lounger committed intentional fraud upon the USPTO in procuring the '905 Registration, which Defendant Ledge Lounger has used relentlessly to argue exclusive rights in a wave-shaped in-pool chaise lounge.

126.    The United States Supreme Court has held that maintenance and enforcement of a patent obtained by fraud on the USPTO may be the basis of an action under § 2 of the Sherman Act as an antitrust violation. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).

127.    The *Walker Process* doctrine and its underlying rationale apply equally to trademark registrations obtained via fraud on the USPTO—particularly where, as here, the trademark at issue relates to a product design and the owner wields the purported trade dress as if it were a de facto, never expiring patent covering all in-pool chaise lounges.

128.    Defendant Ledge Lounger has used the '905 Registration to engage in predatory and anticompetitive conduct against Step2 and other competitors.

129.    On information and belief, Defendant Ledge Lounger's actions were aimed to drive Step2 out of the market for in-pool chaise lounges, to increase Step2's costs and disrupt its business operations, and to monopolize the market.

130.    Defendant Ledge Lounger has a dangerous probability of obtaining monopoly power through its conduct; indeed, the monopoly power sought by Defendant Ledge Lounger through its conduct would be more anticompetitive than the similar use of a fraudulently obtained patent at least because a design patent's life is limited to 15 years from the date of grant, while a trademark remains in effect as long as it is used in commerce.

131.    Step2 has been damaged by Defendant Ledge Lounger's misconduct.

132.    Defendant Ledge Lounger's predatory actions, if allowed to continue, will result in

Defendant Ledge Lounger's gaining control over the market.

133.    Step2 has been damaged by Defendant Ledge Lounger's misconduct and is entitled to monetary relief in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Step2 prays for judgment and relief against Defendant Ledge Lounger and Defendant Anderson, including:

A.    Declaring that the '905 Registration is invalid and unenforceable;

B.    Cancelling the '905 Registration;

C.    Declaring that Step2 has not infringed the '905 Registration;

D.    Awarding Step2 damages attributable to Defendants' wrongful conduct, together with pre-judgment and post-judgment interest;

E.    Awarding Step2 its costs and reasonable attorneys' fees;

F.    Entering permanent and preliminary injunctive relief under the Court's equitable authority, including ordering Defendant Ledge Lounger to take corrective measures to mitigate the irreparable harm it has caused Step2 and to ensure that Defendant Ledge Lounger causes no future irreparable harm to Step2; and

G.    Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff Step2 demands a trial by jury for all issues so triable.

Dated:  August 12, 2024                    Respectfully submitted,

                                           s/ John F. Bennett
                                           John F. Bennett (0074506)
                                           Paul J. Linden (0083699)
                                           Ava M. Abner (0100384)
                                           FROST BROWN TODD LLP
                                           301 East Fourth Street, Suite 3300
                                           Cincinnati, OH 45202
                                           513-651-6423
                                           jbennett@fbtlaw.com
                                           plinden@fbtlaw.com
                                           aabner@fbtlaw.com

                                           Attorneys for Plaintiff
                                           THE STEP2 COMPANY, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August, 2024, I caused the foregoing to be electronically filed with the clerk of courts using the CM/ECF system, which will send a notice of electronic filing to all counsel of record registered with the CM/ECF system.


s/ John F. Bennett
John F. Bennett (0074506)
Counsel for Plaintiff